FARMER, Judge,
dissenting.
In 1988 Penn Mutual (Penn) issued an overhead, business expense, disability insurance policy. Its named insured was Jeffrey Zwirn, born in 1960, who was the president and owner of a 'subchapter S corporation, Intruder Detection Systems, Inc., (IDS). The policy insured Zwirn against disability resulting from sickness or injury. The coverage declaration provided for a “Monthly Benefit From Total Disability of $10,000,” together with an “Overhead Maximum of $150,000.” It further provided that the coverage could be continued to the premium due date after Zwirn’s 65th birthday and that, as long as the premiums were timely paid, Penn could not cancel the policy.
The specific provision on “Disability Benefits” calculated the actual benefit under two separate formulas. Formula A provided for the total amount of covered overhead expenses incurred during the total disability period, and defined “covered expenses” as “the usual overhead expenses you have in running your office or business.”[1] Formula B provided that the Monthly Benefit for Total Disability ($10,000) would be multiplied by the number of months during which the insured was totally disabled. The actual benefits would be the lesser of Formula A and Formula B, reduced by the amount of disability benefits already paid (presumably from other insurance) for the same total disability.
*596 As the primary purpose of the policy was to provide some coverage for business overhead, the policy also addressed the circumstance should Zwirn cease or reduce his business overhead expense and then desire a pure income disability policy. Section 8 of the policy “explain[ed] how you can exchange this policy for a disability income policy and receive a refund, saying as follows:
“You can exchange this policy for any disability income policy we offer for this purpose on the date you want to make the exchange. You must request the exchange in writing. The exchange can only be made before your 60th birthday and while this policy is in force.
“The following conditions apply to this new policy:
• The monthly benefit for total disability that you choose cannot exceed this policy’s Monthly Benefit for Total Disability. Also the monthly benefit cannot exceed an amount which, if added to your disability benefits from other sources, would exceed the maximum monthly benefit we offer to new applicants on the date of the exchange.
• The benefit payable cannot be greater than 24 months. Also disability benefits cannot be payable before the 31st day of total disability.
• The date of issue will be the premium due date on or next after the date we receive your request for the exchange. We must receive the full first premium for the new policy before it becomes effective.
• The premium will be based on our rates in effect on the date of exchange. But your issue age and rate class will be the same as for this policy.
• The new policy will only cover disability or other loss which occurs after the new policy takes effect. The new policy can only exclude any conditions excluded by this policy.”[2]
Only the first condition is in dispute.
In November 1993 — obviously well before Zwirn’s 60th birthday and while the policy was in force — IDS sold the customer list, several security installation contracts and other tangible assets of IDS for a significant price, most of which was treated as a capital gain on Zwirn’s 1993 federal income tax return.[3] After the sale the name of IDS was changed to J.D.Z., Inc., and the corporation continued doing business, receiving payments as a result of the sale in 1994. In fact, Zwirn and the corporation had contractual obligations under the sale to continue to monitor security systems already sold, and part of the price for the sale represented payment for the performance of these duties. So in the sense that part of the price of the sale represented payment for services performed after the sale, Zwirn continued to have earned income after the sale during November/December 1993, and in fact also during 1994.
One result of the sale for IDS and Zwirn was that he no longer needed a formal office, and so he closed the space then used by the corporation and moved its operations to his home. In effect IDS and Zwirn no longer had overhead expenses as before. Therefore in November 1993, at about the time of the sale, he requested an exchange of the overhead policy for a new, individual disability income policy having a monthly benefit of $10,000, and completed Penn’s application therefor. Penn requested that he now also provide his current tax return, explaining that the requested monthly benefit amount in the new policy might exceed the maximum monthly benefit it now offered to new applicants.
Zwirn declined to give the information regarding his income. Penn then gave him two options: (1) cancel the current overhead policy and Penn would reimburse him for the annual premium, or (2) complete the new application and provide the requested information on his income. Zwirn refused on the basis that the exchange provision of the current policy did not require such information or make the carrier’s obligation to make the *597 exchange dependent on such information. Penn thereupon denied the exchange, contending that it could not determine whether the proposed benefit would, if added to any benefits Zwirn received from other sources, exceed the maximum monthly benefit.
Zwirn sued the carrier for a declaratory judgment as to the rights and obligations of the parties under the exchange provision. At trial on the action for a declaratory judgment Penn announced that, owing to discovery responses, it would also adduce evidence to the effect that Zwirn did not have any earned income at the time he requested the exchange. Zwirn’s accountant who prepared his 1993 and 1994 tax returns, testified that there is no single, all purpose definition of the term “earned income” in the tax code; that the only definitional provision related to a tax credit for taxpayers with low income which was inapplicable to Zwirn; and that treating the term “earned income” as synonymous with compensation for services performed, Zwirn did in fact have earned income when he applied for the exchange of policies in November 1993 and also in 1994. Penn offered no contrary evidence on the earned income issue, other than to show that Zwirn refused to supply tax returns for the exchange of policies. Penn did show that its underwriting policies generally require that a new applicant for an individual income disability policy show that he has earned income at the time of the application.
In resolving the issues in favor of Penn, the trial judge apparently did not accept Penn’s contention that Zwirn had no earned income when he sought the exchange of policies. Instead, the trial court decided that Zwirn “is not entitled to exchange the Policy for an individual income policy because he failed to comply with the condition relating to the maximum monthly benefit.” That apparently refers to his failure to show whether he had disability income benefits from some other source, the receipt of which Penn claimed would reduce any benefits under the exchanged policy. He now appeals that judgment and seeks a determination from us that, as a matter of law, he was entitled to exchange the overhead policy for an individual disability benefit policy. I agree.
Let me first suggest that we are not reviewing the factual findings in this case and whether there is record evidence to support them. In this declaratory judgment case, I think we confront a purely legal issue as to the meaning of a contract. If so, we need give no special deference to the trial judge’s conclusion on that legal issue, for deciding legal issues is what we as appellate judges do. Zwirn’s contention is the policy language reflects an entitlement to the exchanged policy upon simple request, and that he could not therefore be required to make an application and qualify as he would have to do if he were a new applicant. On the other hand, Penn argues that the words, “any disability income policy we offer for this purpose on the date you want to make the exchange,” indicate that Zwirn must make application as any new applicant would and qualify initially for a disability income policy.
There is nothing in the current policy requiring income information as a condition for the exchange. The right to exchange the overhead disability policy for a personal disability policy is determined solely by the ■ agreement reflected in the above quoted policy exchange provision. That provision does not say anything about earned income or providing such information as a predicate for an exchange. It basically says that:
(1) the new disability policy must be one of the kinds of personal disability policies that Penn offers on the date the exchange is requested;
(2) the new policy’s monthly benefit cannot exceed the overhead policy’s Monthly Benefit for Total Disability ($10,000); and
(3) the actual monthly benefit under the new policy cannot, together with all of his disability benefits from other sources, exceed the maximum benefit offered to new applicants on the date of the request.
No other pertinent conditions are stated in the exchange provision.
Zwirn requested that the new policy have a Monthly Benefit for Total Disability identical to the one set by the overhead policy, and there is no indication in the record that this amount, $10,000, was no longer available to new applicants. Similarly there is no evi- *598 denee that he sought a new disability policy different from that usually sold by Penn. From the undisputed evidence it appears that Zwirn complied literally with all of the stated conditions for the exchange. I do not understand why Penn needed to know either Zwirn’s current income or whether he was currently receiving disability income benefits from any other source or the amount thereof. It would have been enough for Penn to specify in the exchanged policy — as indeed it did in the current one — that in no event could Zwim’s actual monthly benefit, together with all disability benefits that he receives from other sources, exceed whatever “maximum monthly benefit Penn offers to new applicants on the date of the exchange.”[4]
The controversy did not require the court to determine how much in monthly benefits Zwirn might actually be entitled to receive if he were later to make a claim under the new policy given in exchange for the current one. The only issue was whether he was entitled to a new, individual policy and, if so, the Maximum Benefit for Total Disability to be stated on the coverage declaration page. Just as Penn was able to say with clarity in the current policy that actual benefits paid would be reduced by all such benefits for the same disability from all sources and in any event could not exceed $10,000, so it was surely capable of stating the same provision in the new policy.
The majority has apparently decided this case on the carrier’s argument, first advanced at trial, that it does not offer disability income policies to applicants who do not currently have earned income. The exchange provision of the policy said:
“You can exchange this policy for any disability income policy we offer for this purpose on the date you want to make the exchange. You must request the exchange in writing. The exchange can only be made before your 60th birthday and while this policy is in force.”
The right to the exchange is stated in unconditional terms. My reading of this text is that the right to the exchange is therefore limited to only two conditions: the request must be in writing, and it must be made before Zwirn is 60. Thus Penn contracted away any other condition, such as the right to require that Zwirn qualify for an exchange policy, as new applicants must do for an initial disability income policy. If Penn’s position were correct, it would strip the exchange position of any real meaning, for everyone has the right to apply for anything. If that were all the exchange provision gave Zwirn, it would have no real content at all.
As for other disability income, as I have indicated the current policy has a provision that reduces benefits actually payable by any amount Zwirn would get in disability benefits from anywhere else. The exchange policy should thus have a similar limitation in it, but that hardly means that Penn can avoid giving him the exchange.
In my opinion Penn talked the trial judge into deciding an issue not unambiguously raised by the contractual language, or even reasonably and necessarily implicated by it. I would reverse.

. Another provision, entitled "Corporation Expenses” provided that:
"We will consider you as having a share of each expense a corporation has while you are disabled if: at the time the disability starts, you are both an owner and a full-time employee of the corporation; and you have assigned your right to benefits under this policy to the corporation.”
It then specified what the insured’s share would be under this provision.

. The provision added that "[i]f you stop having overhead expenses, you can cancel this policy and receive a refund.” There is no evidence that Zwirn ever sought to cancel the policy and be given a refund.

. Because the entity was a sub-S corporation, the income was reported on Zwim’s individual tax return.

. So far as I am able to determine, the maximum amount is the same as for the current policy.